**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**ANTHONY D. AMAKER, 89-T-2815,**

                               **Plaintiff,**                07-CV-0279(Sr)

**v.**

**BRIAN S. FISHER, et al.,**

                               **Defendants.**

---

## DECISION AND ORDER

In accordance with 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct all further proceedings in this case, including entry of final judgment. Dkt. #72.

Plaintiff, an inmate of the New York State Department of Correctional Services ("DOCS"), commenced this action seeking injunctive and declaratory relief, as well as compensative and punitive damages for a series of deprivations allegedly inflicted upon him in retaliation for his complaint that DOCS' employees were violating his right to religious practice as protected by the First Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). Dkt. #47. Plaintiff specifically complains that DOCS' employees have denied him privileges and appropriate medical care, fabricated misbehavior reports and transferred him in retaliation for the Court's issuance of a preliminary injunction in a

prior action commenced by plaintiff.[1]  Dkt. #47.  Plaintiff also complains that DOCS' employees discriminate against him (and other followers of the Nation of Islam), and subject them to disparate treatment (as compared to Christians), because of their religious beliefs.  Dkt. #47.  As relevant to the instant motion, plaintiff challenges DOCS' revised policy regarding the amount of personal property an inmate is permitted to possess upon transfer to another facility as a burden upon his constitutional right to practice his religion, in that followers of the Nation of Islam are required to read many books, and upon his ability to access the Court and seek redress of grievances, as he has multiple lawsuits[2] currently pending and his legal papers with respect to those actions exceed the newly imposed limit.  Dkt. #47.

Currently before the Court is plaintiff's motion for a preliminary injunction enjoining defendants from enforcing a policy limiting the volume of inmates' legal work product upon transfer to another correctional facility.  Dkt. #77.  For the following reasons, plaintiff's motion for a preliminary injunction  is denied.

---

[1] Plaintiff is a members of the Nation of Islam/Al-Islam seeking to follow doctrine prohibiting the cutting of hair.  06-CV-490 at Dkt. #22. In that action, plaintiff challenges DOCS' policy of refusing to permit individuals who have designated their religion as anything other than Rastafarian to wear dreadlocks.  06-CV-490 at Dkt. #22. The preliminary injunction enjoined DOCS from: (1) precluding Plaintiffs' attendance at Nation of Islam services and classes on account of Plaintiffs' dreadlocks, and in relation thereto from (2) punishing Plaintiffs for refusing to cut their hair or refusing to change their religious affiliations."  06-CV-490 at Dkt. #115 & 06-CV-602 at Dkt. #33. The preliminary injunction was made permanent by Order of the Hon. Richard J. Arcara, U.S.D.J., entered June 23, 2010.  06-CV-490 at Dkt. #245.

[2] In the Western District of New York, plaintiff has five actions currently pending: 06-CV-490; 07-CV-279; 09-CV-396; 10-CV-88 & 10-CV-464.  Plaintiff's complaint also references New York Court of Claims actions and legal work regarding his criminal conviction.  Dkt. #47. In support of his motion for a temporary restraining order and preliminary injunction, plaintiff alleges that he is also a party to two appeals to the Court of Appeals for the Second Circuit.  Dkt. #77, ¶ 7.

## BACKGROUND

The possession of personal property by inmates is governed by DOCS' Directive 4913. Dkt. #81, ¶ 4. That policy previously provided that DOCS' would transfer four standard department draft bags ("draft bags"), of personal property, along with either a type writer or a musical instrument, to a new facility and that any additional property could be transferred at the inmate's expense. Dkt. #81, ¶ 6. A draft bag measures approximately 23" x 40" and has a capacity designation of 100 pounds. Dkt. #81, ¶ 6.

DOCS' Directive 4913 was revised effective October 23, 2008. Dkt. #81, p.8. The revised policy limits the amount of property that an inmate may possess to four draft bags, plus one additional draft bag of legal materials pertaining to active legal matters, plus a typewriter, musical instrument and television (if the television is properly permitted and otherwise allowed at the facility). Dkt. #81, ¶ 7. Upon transfer to a new facility, DOCS will transfer four draft bags and either a typewriter or musical instrument. Dkt. #81, ¶ 7. The inmate is permitted to transfer the additional draft bag with legal materials as well as a television (if the television is properly permitted and otherwise allowed at the facility), and either a typewriter or musical instrument (if he possesses both), at the inmate's expense. Dkt. #81, ¶ 7. Inmates may chose to ship excess personal property at their expense to a private address; have it removed from the facility by a visitor; donate it to a charitable organization; or have it destroyed. Dkt. #81, p.13.

By Memorandum issued October 23, 2008, Commissioner Fischer declared that all inmates taken into custody on or after January 1, 2009, were immediately subject to the revised policy. Dkt. #81, p.17. Inmates in the system prior to January 1, 2009, were given until July 1, 2010 to come into full compliance with the property limitations with graduated reductions in the amount of personal property permitted upon transfer during the period between January 1, 2009 and July 1, 2010. Dkt. #81, ¶ 13 & p.20. However, any inmate receiving more than 60 days of Special Housing Unit ("SHU"), as of July 1, 2009 was required to comply with the revised policy immediately. Dkt. #81, p.19. In addition, any inmate transferred from SHU to any other facility as of July 1, 2009, was required to comply with the revised policy immediately. Dkt. #81, p.19.

Commissioner Fischer's memorandum to the inmate population regarding Directive 4913 explains that

> The accumulation of excessive inmate personal property has a significant and wide ranging impact on the operation of the entire agency. Examples include, but are not limited to:
>
> • The time consuming and labor intensive process of packing, searching and storing.
>
> • Fire and safety hazards within inmate living quarters related to the accumulation of excessive "fire load" items.
>
> • Sanitation and hygiene issues associated with the long-term storage of unused food items, clothing and paper.

- Increased risk of loss, theft and pilferage, and the resulting lost property claims and potential violence.

- Escalating cost of statewide storage areas.

Dkt. #81, p.16.

Elmira Deputy Superintendent for Security ("DSS"), Wenderlich, declares that plaintiff was issued two misbehavior reports and placed in SHU on December 12, 2009. Dkt. #83, ¶ 4. He was notified that upon transfer to another facility, he would only be allowed to take four draft bags of property, but would be allowed to ship a fifth draft bag of legal materials at his own expense. Dkt. #83, ¶ 6. On December 24, 2009, plaintiff was found guilty of harassment and violation of movement regulation and sentenced to three months confinement in SHU. Dkt. #83, ¶ 8. On February 2, 2010, plaintiff was found guilty of demonstrating, leading a disturbance, interfering with an employee, refusing a direct order, being out of place, and violation of movement regulation and sentenced to six months confinement in SHU with respect to the second misbehavior report. Dkt. #83, ¶ 9.

DSS Wenderlich declares that pursuant to DOCS' practice of transferring an inmate to a different facility from that in which he was housed when the misbehavior was committed when the disposition exceeds 45 days of SHU confinement, plaintiff was transferred from Elmira to Southport on February 16, 2010. Dkt. #83, ¶ 10. As plaintiff was sentenced to more than 60 days in SHU, he was required to comply with the revised policy upon his transfer to SHU. Dkt. #81, ¶ 20.

Elmira Draft Officer Schrijver packed four bags of plaintiff's personal property and sent them to Southport, along with plaintiff's typewriter. Dkt. #83, ¶ 11. Officer Schrijver also packed five bags of plaintiff's legal work. Dkt. #83, ¶ 11. Sergeant Killacky spoke to plaintiff and informed him that he could forward one bag of legal materials to Southport at his own expense, but plaintiff insisted that all five bags be sent to Southport and refused to sign a disbursement form authorizing the withdrawal of funds from his account to pay for shipping a fifth bag of legal materials. Dkt. #83, ¶ 12.

Southport DSS Sheahan declares that five draft bags containing plaintiff's legal work were transferred from Elmira to Southport at his request and remain secured at Southport. Dkt. #81, ¶ 24. DSS Sheahan declares that plaintiff will be permitted to go through his legal materials and cull one draft bag pertaining to active cases and may choose how to dispose of the remaining legal materials. Dkt. #81, ¶ 25.

By Notice of Motion dated January 17, 2010, plaintiff moved for an expedited hearing, temporary restraining order and preliminary injunction restraining defendants from limiting the plaintiff's legal work product to one duffel bag. Dkt. #77. By Text Order entered March 5, 2010, the Court set a scheduling order for the motion for preliminary injunction and directed defendants "to retain any legal materials removed from plaintiff's cell at Elmira and which are not returned to plaintiff at Southport in a secure location in the containers in which they were packed until plaintiff's motion for injunctive relief is resolved." Dkt. #79.

In response to the motion for injunctive relief, Edward Bly, Director of the Corrections Emergency Response Team ("CERT"), declares that:

> the amount of legal work possessed by the overwhelming majority of the inmate population is diminutive. As with any correctional system, DOCS does have a few extremely litigious inmates, some of whom acquire, over time, almost insurmountable volumes of legal papers, briefs and documents. The volumes of legal documentation acquired over time by these inmates eventually require intervention, usually for health and safety reasons, created by the vast amount of paper and the potential fire hazard placing not only the inmate, but ultimately the inmate population, staff and visitors at risk. It should also be noted that I know of several situations where inmates have used legal documents to hide gang and gang related material. This is especially problematic when the inmate posses[ses] great volumes of legal materials.

Dkt. #82, ¶ 9. Elmira DSS Wenderlich and Southport DSS Sheahan declare that

> Limitations on personal property are imposed to ensure that DOCS regulates the accumulation of personal property for inmates in DOCS facilities. Excessive property creates health and safety hazards, increases opportunities for theft or loss of property, interferes with the ability of staff to search for contraband, and creates packing and storage problems. Directive 4913 protects the health and safety of employees and inmates alike while ensuring the secure and orderly operation of facilities.

Dkt. #81, ¶ 26 & Dkt. #83, ¶ 15.

Plaintiff moved to hold this case in abeyance pending the return of his legal materials, alleging that he is unable to move to amend his complaint or conduct discovery without his legal materials. Dkt. #78. Plaintiff filed a similar motion in 09-CV-396, asserting that DOCS' employees

> confiscate[d] all my work product in four pending civil rights cases in this court.

> They have furthermore confiscated two entire civil rights cases on appeal in the U.S. Court of Appeals for the Second Circuit. They have taken every exhibit[], research material, deposition, trial transcript, police report, attorney communication and Court of Claims files . . . .
>
> Until such documents are return[ed] I am unable to proceed further to amend the complaint . . . . The files concerning this case goes back into 2004, which all relevant grievances, medical records, etc., has [sic] been confiscated . . . .

09-CV-396 at Dkt. #21.

## **DISCUSSION AND ANALYSIS**

**Preliminary Injunction Standard**

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167-68 (W.D.N.Y. 1997), *citing Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994).

"The purpose of a preliminary injunction is to prevent irreparable injury and preserve a court's ability to render a meaningful decision on the merits." *Johnson v. Newport Lorillard*, No. 01 Civ. 9587, 2003 WL 169797 at *1 (S.D.N.Y. Jan. 23, 2003). In most cases, a party seeking to obtain a preliminary injunction must establish that he will suffer irreparable harm in the absence of an injunction and demonstrate either: (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping

decidedly in the movant's favor. *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996). "Where a moving party challenges government action taken in the public interest pursuant to a statutory or regulatory scheme, however, the moving party cannot resort to the fair ground for litigation standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits." *Id.* (internal quotations omitted).

In addition, where an injunction is mandatory – that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act – the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from a denial of the injunction. *Phillip v. Fairfield University*, 118 F.3d 131, 133 (2d Cir. 1997). "This heightened standard is also required where the issuance of the injunction would provide the movant with substantially all the relief he or she seeks and where the relief could not then be undone, even if the non-moving party later prevails at trial." *Id.* To demonstrate irreparable harm, the moving party must establish that without the preliminary injunction, he will suffer an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Murray v. New York*, 604 F. Supp.2d 581, 584 (W.D.N.Y. 2009).

**Access to the Courts**

"It is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977), *accord Lewis v. Casey*, 518 U.S. 343, 350 (1996). "The right of access to the courts requires

that prisoners defending against criminal charges or convictions (either directly or collaterally) or challenging the conditions of their confinement . . . not be impeded from presenting those defenses and claims for formal adjudication by a court." *Bourdon v. Loughren*, 386 F.3d 88, 96 (2d Cir. 2004). Inmate access to the court must be "adequate, effective, and meaningful." *Bounds*, 430 U.S. at 822. To establish a violation of this right, an inmate must demonstrate "actual injury" by showing "that a non-frivolous legal claim had been frustrated or was being impeded" because of the inadequate access. *Lewis*, 518 U.S. at 353 (footnotes omitted).

Moreover, prison regulations will be upheld as valid, even if the regulation impinges upon inmates' constitutional rights, if the regulation "is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). This deferential standard "ensures the ability of corrections officials to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to resolution by decree." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (internal quotation & citation omitted).

In assessing reasonableness, courts must find a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* In addition, "the governmental objective must be a legitimate and neutral one." *Id.* at 90. Courts should also consider whether there are alternative means of exercising the right that remain open to prison inmates and "the impact

accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.*

As a result, while it is clear that DOCS cannot deprive plaintiff of his *pro se* work product entirely, courts have found limitations on the quantity of legal materials inmates are permitted to possess to be reasonable. *Cf. Morello v. James*, 810 F.2d 344, 347 (2d Cir. 1987) (confiscation of appellate briefs and records, as well as research materials relating to appeal stated claim for denial of access to the courts); *Cruz v. Hauck*, 515 F.2d 322, 333 (5th Cir. 1975) (legitimate restrictions on storage of legal materials should not act as a total bar to the storage of such materials), *cert. denied sub nom Andrade v. Hauck,* 424 U.S. 917 (1976); *Frazier v. Forgione*, 881 F. Supp. 879, (W.D.N.Y. 1995) (intentional withholding of legal papers for two years violated inmate's constitutional right to access to the courts), *with DeFusco v. Crabtree,* 990 F.2d 1256, 1993 WL 91273 (9th Cir. 1993) (unpublished opinion) (inmate's right to meaningful access to the courts was not violated by regulation restricting personal legal materials in administrative detention to one cubic foot); *Green v. Johnson*, 977 F.2d 1383, 1390 (10th Cir. 1992) (prison rule permitting inmates two cubic feet of legal materials in their cells held reasonable and necessary for orderly maintenance of the facility and proper security).

Applying these standards to the instant case, the Court concludes that plaintiff cannot establish irreparable harm as there is no evidence that he has suffered an actual injury as a result of DOCS' Directive 4913. The Court will not credit plaintiff's

complaint that he has been completely deprived of his legal materials when that deprivation stems from his own refusal to cull one draft bag of legal materials from his five draft bags of legal materials. *See Avent v. Doe*, 05-CV-1311, 2008 WL 877176, at *10 (N.D.N.Y. Mar. 31, 2008) ("Plaintiff cannot create his own denial of access to courts by refusing to obtain property that is being held for him."). Any claim that one draft bag of legal materials is insufficient to allow plaintiff to meaningfully prosecute his legal claims is completely speculative pending plaintiff's good faith attempt to do so. *See McAllister v. Goord*, 06-CV-442, 2009 WL 5216953 (N.D.N.Y. Dec. 30, 2009) (conclusory allegations that future legal work will be hampered by possible loss of property upon implementation of revised DOCS Directive 4913 does not meet the standard for injunctive relief).

Even if plaintiff was able to demonstrate irreparable harm, the Court is not persuaded that plaintiff is likely to succeed on the merits of his claim. DOCS' Directive 4913 appears reasonably related to DOCS' legitimate interest in maintaining prison security and protecting inmates from health and safety risks. For example, it seems rational that an inmate's accumulation of five draft bags of legal materials could pose a fire hazard, impede DOCS' efforts to control contraband, and impose administrative burdens upon DOCS during an inmate's transfer. Moreover, DOCS appears to have balanced plaintiff's constitutional right to access the courts with its legitimate penological interests by allowing inmates to possess an additional draft bag of personal property to accommodate legal materials pertaining to active legal matters. The Court is skeptical that plaintiff, or any inmate, requires more than one draft bag of legal

materials to achieve meaningful access to the courts, but notes in any event that the revised policy appears to permit inmates to choose between legal materials and other personal property with respect to the four draft bags DOCS will transfer at state expense should the fifth draft bag prove insufficient.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction enjoining defendants from enforcing DOCS Directive 4913 is denied. Plaintiff shall be afforded sufficient opportunity to sort through his five draft bags of legal materials to cull one draft bag of legal materials to retain and to dispose of the remaining materials in accordance with the provisions of DOCS Directive 4913.

**SO ORDERED.**

DATED:  Buffalo, New York
        June 23, 2010

　　　　　　　　　　　　　　　　　　  s/ H. Kenneth Schroeder, Jr.
　　　　　　　　　　　　　　　　　　**H. KENNETH SCHROEDER, JR.**
　　　　　　　　　　　　　　　　　　**United States Magistrate Judge**